| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | **NOT FOR PUBLICATION** |
| JULIANNE POLITO,<br><br>       Plaintiff,<br><br>– against –<br><br>THE CITY OF NEW YORK, THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE OF THE CITY OF NEW YORK, PATRICIA PATE, Individually and in her Official Capacity as Director of Provider Oversight, Bureau of Early Intervention of THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE OF THE CITY OF NEW YORK, NORA PUFFETT, Individually and in her Official Capacity as Director of Administration and Data Management of THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE OF THE CITY OF NEW YORK, DOLORES GIURDANELLA, Individually and in her Official Capacity as Director of the Manhattan Regional Office of the Bureau of Early Intervention Program of THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE OF THE CITY OF NEW YORK, JOHN AND JANE DOES 1 through 10, Individually and in his, her and its respective capacities as Officials of the City of New York and/or the State of New York, and JOHN AND JANE DOES 1 through 10, Individually,<br><br>       Defendants. | **MEMORANDUM & ORDER**<br><br>15-CV-2301 (ERK) (RML) |

KORMAN, *J*.:

  On April 21, 2015, plaintiff Julianne Polito ("Polito") filed a complaint principally seeking damages against the City of New York ("the City"), the Department of Health and Mental Hygiene ("DOHMH"), two named employees of DOHMH's Bureau of Early Intervention, Patricia Pate and Nora Puffett, ten unnamed government officials, and ten unnamed private individuals (together, "the Defendants"). The complaint asserted chiefly that the Defendants had violated

Polito's right to procedural due process in pressuring Hand-in-Hand Development, Inc. ("HIH"), a non-governmental agency involved in the provision of Early Intervention services to children with developmental disabilities, to terminate its relationship with Polito based on a purportedly false complaint from a parent. The complaint also alleged a number of state tort-law violations. The Defendants have moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the complaint.

## FACTS

### I. Background.

Polito alleges that, in 2006, she began working for HIH as an Early Intervention provider as part of New York State's Early Intervention Program, which provides support services to eligible children with developmental disabilities. Compl. ¶ 39. In order to serve as an Early Intervention provider, Polito had to obtain approval from the state. *Id.* ¶ 98. One can qualify as a provider by possessing certain certifications, including a license to teach special education. *Id.* ¶ 46. Polito alleges that she holds a license to teach special education, which enabled her to be approved to work in the Early Intervention Program. *Id.* ¶¶ 32, 34. In 2011, Polito began working for HIH on a largely full-time basis. *Id.* ¶¶ 39, 57. HIH is one of several agencies that act as intermediaries between the state, which screens children for eligibility for the Early Intervention Program, and the individual service providers, such as Polito, who work with the children. *Id.* ¶ 42. It is a private, non-governmental entity. Pl.'s Opp'n 15. Polito acknowledges that she was "an independent contractor" for HIH whose contract with HIH was terminable "at will." Compl. ¶ 173.

### II. Termination from HIH.

Polito alleges that on or around January 20, 2014, representatives of HIH requested to meet with her. *Id.* ¶ 48. At that meeting, she was told that HIH had been contacted by officials affiliated with the City's Bureau of Early Intervention, specifically Pate and/or Puffett, who claimed to have received a complaint from a parent that her child had been assigned to work with Polito. *Id.* ¶¶

49–50. Polito alleges that the complaint, which apparently accused her of engaging in "misconduct," was unfounded, *id.* ¶ 100, and that she "had never rendered any Early Intervention Services to any children of this parent," *id.* ¶ 50. According to Polito, HIH told her that because of the complaint and "some unidentified and alleged lawsuit that Dr. Polito had allegedly filed," *id.* ¶ 177, Pate and/or Puffett had threatened to stop referring cases to HIH if it did not terminate its contract with her, *id.* ¶ 51. Pate and/or Puffett also allegedly indicated to HIH that the City had begun the process of terminating her approval as an Early Intervention provider. *Id.* ¶ 52.

Polito relies on several emails to support her claims, which were provided to her either by HIH or by the Defendants in response to a September 8, 2015 order issued by Magistrate Judge Levy. On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), I can consider those documents which Polito incorporates by reference in her complaint or on which she relied in bringing this action—these emails qualify under both of these categories. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Polito argues that the emails substantiate her contentions that the Defendants knew that they were acting unlawfully in pressuring HIH to end its relationship with her and that they attempted to sabotage her employment prospects with Early Intervention agencies other than HIH as well. I provide the relevant excerpts of the emails below:

- January 6, 2014: Pate emails Giurdanella, another official at the City's Bureau of Early Intervention, presumably after receiving the parent's complaint, stating, "We are trying to figure out exactly what we can/cannot do and whether or not the provider agency is within its rights to subcontract with this person. She still has all of her certifications with NYC DOE, so not sure what we can do, but hope to ask the State." Compl. ¶ 65.
- January 7, 2014: Giurdanella to Pate, stating, "I sent an email to the EIODs [employees working in the City's Early Intervention Program] as well to be on the lookout for any progress notes, requests to increase services, ect. [sic] From [sic] this individual. I will keep you posted if we should see her come up with another agency as well." *Id.* ¶ 67.
- January 15, 2014: Pate to Beth Statfield, CEO of HIH, asking if Pate and Puffett can have a conversation with Statfield about "an individual . . . provider issue." *Id.* ¶ 58.
- January 22, 2014: Pate to Statfield, asking, "Any update on the issue with Julianne Polito, as per our discussion last week?" *Id.* ¶ 59.

- January 28, 2014: Leah Lax, Education Director of HIH, to HIH receptionist Rachel Uretsky, stating, "Please tell Ms. Polito that Ms. Pate contacted us last week on Wednesday to make sure that we met and followed their recommendation." *Id.* ¶ 60.

Polito claims that her contract with HIH was terminated on January 28, 2014. *Id.* ¶ 55. On February 26, 2014, however, Pate wrote to HIH, copying Polito, and stated that it had been informed by Polito's counsel about her alleged conversation with HIH. In this letter, Pate rejected Polito's suggestion that DOHMH had pressured HIH, averring that, "should Hand-in-Hand decide to allow Dr. Polito to resume providing Early Intervention services on its behalf, DOHMH will not take any adverse action against Hand-in-Hand as a result of such decision."[1] Pl.'s Opp'n 4. On or about April 17, 2014, Polito resumed providing Early Intervention services through City Pro Group, Inc., another intermediary agency like HIH in the Early Intervention Program. Compl. ¶ 81. Nonetheless, because she "believed that the same disruption in her income from City Pro, Inc. could occur at any time," based on her suspicion that officials at the Bureau of Early Intervention were "on the lookout for" her, Polito moved to Florida to seek teaching jobs. *Id.* As of the filing of her complaint on April 21, 2015, neither New York State nor the City has taken any formal adverse action against Polito's teaching licenses or her certification to provide Early Intervention services. *Id.* ¶ 83. She thus remains eligible to work as an Early Intervention provider in New York. *Id.* ¶¶ 37, 41.

III. Procedural History.

On April 16, 2014, one day before she began work as an Early Intervention provider with City Pro Group, Inc., Polito served a notice of claim under New York State law on the City and DOHMH. *Id.* ¶ 164. She then filed this lawsuit on April 21, 2015, seeking monetary damages as well as declaratory and injunctive relief. On July 17, 2015, she moved pursuant to Fed. R. Civ. P.

---

[1] I mention the February 26, 2014 letter only for background; because Polito neither incorporates it into her complaint nor relies on it, I do not rely on it for purposes of disposing of the Rule 12(b)(6) motion. *See Chambers*, 282 F.3d at 153.

4

19 for an order that the known defendants identify any unknown defendants so that she could name them in an amended complaint. Pl.'s Opp'n 5. Polito's motion revealed that she was primarily interested in discovering the name of the parent who had purportedly complained about her. *See* Pl.'s Mem. Supp. Mot. Join Necessary Parties 5–7. On July 29, following a hearing, Magistrate Judge Levy ordered that the motion for joinder would be granted to the extent that the individual whose complaint initiated Polito's termination was a public official, but that, if the person was a private actor, a decision on that motion would be deferred until after the newly pending motion to dismiss was decided. Magistrate Judge Levy then directed counsel for the Defendants to file an affidavit stating whether there were any "heretofore undisclosed state actors" involved in the complaint to DOHMH. On August 26, in response to Polito's objection to the Defendants' subsequently submitted affidavit stating that the complaint had come from a private individual, Magistrate Judge Levy ordered the Defendants to submit for in camera review the emails that described the complaint about Polito. After reviewing the emails, he denied the motion for joinder, but directed Defendants to produce them to Polito. Based on those emails, Polito filed an amended complaint on October 23, 2015, naming Giurdanella as an additional defendant.

IV. Past Background.

Before proceeding to the analysis, I pause to describe briefly background events that led up to this case and to the purported parent's complaint regarding Polito. Prior to the events presented above, Polito had served in a variety of teaching and administrative roles in the City's school system from 1992 until 2011, when she retired from working for the school district. Compl. ¶ 26. During her employment as a teacher, she took part in an unsuccessful lawsuit against the City that, among other claims, challenged the constitutionality of its treatment of suspended teachers. *Adams v. New York State Educ. Dep't*, 752 F. Supp. 2d 420, 431 (S.D.N.Y. 2010). The series of decisions in that case, which mention various accusations against Polito including that

5

she had employed corporal punishment in the classroom, *see id.* at 438–40, are publicly available and so could have provided the substance of the parental complaint at issue here. Moreover, Polito separately challenged in state court a fine imposed on her by the City's Department of Education for allegedly tossing a book at a special education student and stating, "Here Mr. Smarty Pants, let's see if you can read." *Polito v. New York City Dep't of Educ.*, No. 104919/2011 (N.Y. Sup. Ct. Jan. 5, 2012). That fine, while reduced by the Appellate Division, was upheld. *Polito v. New York City Dep't of Educ.*, 962 N.Y.S.2d 120, 122 (App. Div. 2013). The decision in that case is also publicly available and was reported in the *New York Post*. Julia Marsh, *Rubber-Room Teacher Gets $7,500 Fine Slashed*, N.Y. Post (Mar. 29, 2013), http://nypost.com/2013/03/29/rubber-room-teacher-gets-7500-fine-slashed/. According to Magistrate Judge Levy's September 8, 2015 order in the present case, this article was "attached to the complaint received from the private individual" about Polito. Given this and the declaration submitted by Pate in opposition to Polito's joinder motion, which I mention above and which stated that "[t]he parent who initiated the chain of emails was concerned that Ms. Polito had allegations of corporal punishment lodged against her while she was a teacher," Pate Decl. ¶ 3, it appears that the state-court litigation probably formed the basis of the complaint, although Polito never specifically says as much.

## ANALYSIS

I. <u>Standard of Review.</u>

When reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "[t]he court accepts all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's favor." *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010). To survive a motion to dismiss, the plaintiff's complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

II. <u>Claims</u>.

Polito brings her due process claims, *see infra* sections II.A.–C., under 42 U.S.C. § 1983. To establish a claim under that statute, she must demonstrate a violation of a right protected by the Constitution or laws of the United States that was committed by or caused to be committed by a person acting under the color of state law. *Whalen v. Cty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997). As a preliminary matter, the claims against DOHMH must be dismissed because, as a municipal agency, it is not suable under section 1983. *Nnebe v. Daus*, 644 F.3d 147, 158 n.6 (2d Cir. 2011). This dismissal is "of no practical consequence," however, because a municipal agency must "abide by any relief ordered against the City of which it is a non-severable part." *Id.* I now proceed to analyze Polito's claims individually.

A. <u>Procedural Due Process—Notice and Opportunity to be Heard.</u>

In her first claim for relief, Polito alleges a violation of her right to procedural due process—namely, notice and an opportunity to be heard. Compl. ¶ 90. To plead a violation of procedural due process, "a plaintiff must 'first identify a property right, second show that the [government] has deprived him of *that* right, and third show that the deprivation was effected without due process.'" *J.S. v. T'Kach*, 714 F.3d 99, 105 (2d Cir. 2013) (alterations in original) (quoting *Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994)). As a threshold matter, the right to procedural due process is thus dependent on a showing that the plaintiff was deprived of a constitutionally protected "property interest." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576 (1972). To constitute a protected property interest, "a person clearly must have more than an abstract need or desire" and "more than a

unilateral expectation" as to the claimed interest. *Id.* at 577. Instead, she must "have a legitimate claim of entitlement to it," which is "created and . . . defined by existing rules or understandings that stem from an independent source such as state law." *Id.* Polito argues that she had such an interest in "her licenses and certificate as an Early Intervention Provider and the right to use her licenses and certificates which rights were granted to her by State law." Compl. ¶ 88.

It appears that the license at issue does constitute a protected property interest. *See Bell v. Burson*, 402 U.S. 535, 539 (1971) ("Suspension of issued licenses . . . involves state action that adjudicates important interests of the licensees . . . [such that] the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment."). Under the statutory scheme governing the provision of Early Intervention services in New York, individual providers must be approved by the Department of Health based on certain qualifications, including, for instance, possessing a license to teach special education. *See* N.Y. Pub. Health Law § 2541(15)(a)(i); N.Y. Comp. Codes R. & Regs. tit. 10, § 69-4.5. Providers are entitled to notice and an opportunity to be heard before their approval is revoked, suspended, limited, or annulled. *See* N.Y. Comp. Codes R. & Regs. tit. 10, § 69-4.24(b). Given the limits on the discretion to affect a provider's certification, it appears that Polito did have a legitimate claim of entitlement to her approval to provide Early Intervention services. However, as to her related contention about the right to use the license, she points to no basis in state law for why that license would also provide her with a "legitimate claim of entitlement to employment." *Lombard v. Bd. of Educ.*, 645 F. Supp. 1574, 1577 (E.D.N.Y. 1986). As a result, the only protected property interest at stake here is Polito's license to provide Early Intervention services.

Nevertheless, Polito's claim as to her license to participate in the Early Intervention Program fails because she cannot establish that the Defendants deprived her of that license. This is because: (i) Polito admits no formal action has been taken against her licenses, Compl. ¶ 83,

8

and, significantly, (ii) she acknowledges that she was able to continue to use her license through a different agency within three months of the termination of her contract with HIH, *id.* ¶ 81. The latter fact renders implausible any argument that Polito was denied the "right to use" her license.[2] *Id.* ¶ 88.

Polito's procedural due process claim also fails because she was entitled to sufficient post-deprivation process via a proceeding pursuant to N.Y. C.P.L.R. Article 78. A deprivation effectuated through the random and unauthorized acts of government officials, as opposed to via established state procedures, does not violate procedural due process "so long as the [government] provides a meaningful postdeprivation remedy." *Hellenic Am. Neighborhood Action Comm. v. City of New York* (*HANAC*), 101 F.3d 877, 880 (2d Cir. 1996); *see also Hudson v. Palmer*, 468 U.S. 517, 533 (1984). The Second Circuit has observed that:

> The distinction between random and unauthorized conduct and established state procedures . . . is not clear cut. In *Zinermon v. Burch*, the Court held that government actors' conduct cannot be considered random and unauthorized . . . if the state delegated to those actors "the power and authority to effect the very deprivation complained of . . . [and] the concomitant duty to initiate the procedural safeguards set up by state law" . . . . This court has since relied on *Zinermon* to hold that the acts of high-ranking officials who are "ultimate decision-maker[s]" [as to a particular act] . . . should not be considered "random and unauthorized" . . . .

*Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) (Sotomayor, J.) (quoting *Zinermon v. Burch*, 494 U.S. 113, 138 (1990), and *Velez v. Levy*, 401 F.3d 75, 92 n.14 (2d Cir. 2005)). While Polito concedes that the conduct here was not based on state procedures, *see* Compl. ¶¶ 47, 76–77, 82, it is also clear from the applicable regulations that the individual defendants had no authority to suspend or revoke Polito's Early Intervention license or to initiate

---

[2] The Supreme Court has held that temporary deprivations of property can implicate an individual's due process rights. *See, e.g.*, *Fuentes v. Shevin*, 407 U.S. 67, 84–85 (1972). As a result, a license suspension can require certain process to avoid a constitutional violation. *See, e.g.*, *Barry v. Barchi*, 443 U.S. 55, 67 (1979). Nevertheless, Polito does not allege that her license was suspended, and the facts alleged do not support the existence of a de facto suspension as she was quickly able to find new Early Intervention work.

9

the procedural safeguards that would accompany such an action; rather, that authority lies with the New York State Department of Health, *see* N.Y. Comp. Codes R. & Regs. tit. 10, § 69-4.24(b). "The controlling inquiry" in determining if an action was random and unauthorized is "whether the state is in a position to provide for predeprivation process." *Hudson*, 468 U.S. at 534. Because it was not in such a position here, the alleged conduct was random and unauthorized.

In cases involving random and unauthorized conduct, the Second Circuit has consistently found that the availability of a postdeprivation Article 78 proceeding provides a plaintiff with a meaningful opportunity to challenge agency action sufficient to ensure due process. *See HANAC*, 101 F.3d at 881 ("We have held on numerous occasions that an Article 78 proceeding is a perfectly adequate postdeprivation remedy."); *Gudema v. Nassau Cty.*, 163 F.3d 717, 724–25 (2d Cir. 1998); *Giglio v. Dunn*, 732 F.2d 1133, 1134 (2d Cir. 1984); *see also Griffin v. City of New York*, 880 F. Supp. 2d 384, 404 (E.D.N.Y. 2012). Moreover, the fact that the limitations period to initiate such a proceeding may have run is not relevant in evaluating Polito's federal case. *See HANAC*, 101 F.3d at 881; *Giglio*, 732 F.2d at 1135 n.1.

Polito argues that an Article 78 proceeding was not available to her because "there was no final agency determination." Pl.'s Opp'n 23. Nonetheless, the distinction she appears to be making between de jure and de facto agency action—the latter being unlikely to result in a formal "final agency determination"—is not a relevant one. *See, e.g.*, *HANAC*, 101 F.3d at 881 (holding that Article 78 proceeding was sufficient postdeprivation process to reject procedural due process challenge to a de facto agency action). The Article 78 proceeding provided Polito with sufficient due process. As a result, her first procedural due process claim must be dismissed.

B. Procedural Due Process—Stigma-Plus.

Although Polito frames her second claim for relief as a violation of her right to substantive due process, it is more accurately construed as a "stigma-plus" claim, which is considered "a

species within the phylum of procedural due process claims." *Segal v. City of New York*, 459 F.3d 207, 213 (2d Cir. 2006). Specifically, Polito alleges that the Defendants violated her "liberty interest in her good name and reputation . . . by communicating . . . false allegations of misconduct and by falsely accusing [her] of being incompetent, engaging in misconduct, and unemployable in her occupation." Compl. ¶ 100. The stigma-plus doctrine provides, "in limited circumstances[,] . . . a remedy for government defamation under federal constitutional law." *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004). Such a claim "[r]equires a plaintiff to allege (1) the utterance of a statement about her that is injurious to her reputation, 'that is capable of being proved false, and that he or she claims is false,' and (2) 'some tangible and material state-imposed burden . . . in addition to the stigmatizing statement.'" *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) (alteration in original) (quoting *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001)). The allegedly stigmatizing statement must be "sufficiently public to create or threaten a stigma." *Id.* Injury to reputation alone, however, is insufficient to make out a claim. *See Paul v. Davis*, 424 U.S. 693, 711–12 (1976). The second element, the "plus," can be satisfied by establishing the deprivation of a property interest created by state law. *Greenwood v. New York, Office of Mental Health*, 163 F.3d 119, 124 (2d Cir. 1998). Finally, "a stigma-plus claim [only] enforces a limited but important right: the right to be heard . . . [at a] name-clearing hearing." *Segal*, 459 F.3d at 213.

Polito fails to state a stigma-plus claim for several reasons. Passing over the fact that she admits that she was able to secure a new contract as a provider of Early Intervention services through a different agency within three months of the termination of her contract with HIH, Compl. ¶ 81, and thus she likely cannot prove the deprivation by the state of a tangible interest, she fails to identify the specific defamatory statements she claims injured her reputation. One cannot make a "reasonable inference that the defendant is liable for the misconduct alleged"—here, that the defendants' statement was injurious to Polito and was capable of being proven false—where she

11

does not allege any facts on which to base such an inference. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If, as seems likely, the statement here was merely relaying that a parent was uncomfortable with Polito working with her child because Polito had previously faced accusations of using corporal punishment, *see, e.g.*, Compl. ¶ 177, it would not be capable of being proven false. *See Polito v. New York City Dep't of Educ.*, 962 N.Y.S.2d 120, 122 (App. Div. 2013); *see also Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) (judicial notice can be taken of other litigation to establish the fact of its existence). Finally, even if Polito had stated a cognizable stigma-plus claim, it would fail as a matter of law because she was entitled to adequate process to give her the chance to clear her name through an Article 78 proceeding. *See Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 121 (2d Cir. 2011); *Griffin*, 880 F. Supp. 2d at 404–05; *see also HANAC*, 101 F.3d at 880–81 (sufficient process to reject due process claims based on property interest necessarily sufficient for stigma-plus claims based on liberty interest).

Before moving on from Polito's constitutional claims, I note that I need not consider whether the rights at issue in this case were clearly established for purposes of evaluating the individual defendants' entitlement to qualified immunity because Polito's rights were not violated in the first place. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (affirming that the protocol mandated by *Saucier v. Katz*, 533 U.S. 194 (2001), whereby a court was required to evaluate first whether a right had been violated before considering whether the right was clearly established, while no longer mandatory, "is often beneficial").

C. <u>Failure to Train, Supervise, Audit, and Discipline.</u>

In her third claim for relief, Polito asserts that the City and DOHMH should be liable for the constitutional violations of their employees based on several different theories of municipal liability. To hold a municipality liable under 42 U.S.C. § 1983, a plaintiff must prove that the deprivation of her federal rights was caused by a governmental custom or policy; this requirement

ensures that a local government will not be held liable unless its own acts, rather than the unsanctioned decisions of its employees, are "the moving force of the constitutional violation." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). As an initial matter, this claim fails because, as described above, Polito has not stated a claim for an underlying constitutional violation. "*Monell* does not provide a separate cause of action . . . ; it *extends* liability to a municipal organization where . . . the policies or customs that it has sanctioned[ ] led to an independent constitutional violation." *Segal*, 459 F.3d at 219.

Even assuming that Polito has stated a claim for a constitutional violation, she nonetheless fails to state a *Monell* claim. Her claim for relief against the City and DOHMH can be construed to allege two recognized avenues to establishing a governmental custom or policy, *see* Compl. ¶¶ 103–156: (i) liability extends to a municipality "where a single act is taken by a municipal employee who, as a matter of state law, has final policymaking authority in the area in which the action was taken," *Davis v. City of New York*, 228 F. Supp. 2d 327, 337 (S.D.N.Y. 2002) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986)), and (ii) liability extends where there has been a failure to supervise or train that exhibits "deliberate indifference" to the underlying constitutional violations of non-policymaking employees of the municipality, *see Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 127–28 (2d Cir. 2004) (Sotomayor, J.).

Polito's first asserted basis for municipal liability fails because, again, she acknowledges in her complaint that the individual defendants did not have policymaking authority to determine whom Early Intervention agencies can hire to provide services or when they should terminate providers. *See* Compl. ¶¶ 82 ("Municipal Defendants do not have legal authority to terminate an Early Intervention Provider."), 47, 151. As a result, Pate, Puffett, and Giurdanella clearly did not have final policymaking authority in this area. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("[T]he challenged action must have been taken pursuant to a policy adopted by the

. . . officials responsible under state law for making policy in *that area* of the city's business."); *Jeffes v. Barnes*, 208 F.3d 49, 57–58 (2d Cir. 2000) ("Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law.").

Her second claimed basis for *Monell* liability also fails because Polito has not alleged that municipal *policymaking* officials were deliberately indifferent. *See Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012). To establish deliberate indifference, a plaintiff must show that

> (i) [A] policymaker knows 'to a moral certainty' that city employees will confront a particular situation; (ii) the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult' or 'there is a history of employees mishandling the situation;' and (iii) 'the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.'

*Wray v. City of New York*, 490 F.3d 189, 195–96 (2d Cir. 2007) (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)). A plaintiff must thus allege either that policymakers were aware of a situation in which constitutional violations have occurred or will occur, or that they should have been aware of such a situation. *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997); *Amnesty Am.*, 361 F.3d at 126–28 (deliberate indifference established by showing that the need for more supervision is obvious to a policymaking official); *see also Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (*Monell* is satisfied "where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that [it] has acquiesced in or tacitly authorized its subordinates' unlawful actions").

Polito fails to allege awareness on the part of a policymaking official or any pattern of conduct that should have produced such awareness. Moreover, Polito alleges no facts in support of her failure-to-train claim as to any "specific deficiency in the city's training program." *Amnesty Am.*, 361 F.3d at 129; *see also City of Canton v. Harris*, 489 U.S. 378, 390 (1989). The "stringent standard" to show deliberate indifference, *Bd. of Cty. Comm'rs*, 520 U.S. at 410, is in place to

make sure that a municipality is not held liable for actions that are not truly its own and Polito has failed to allege facts that would meet this standard.

    D. <u>Conspiracy to Violate Civil Rights.</u>

Polito's fourth cause of action, that the Defendants conspired to violate her civil rights under 42 U.S.C. §§ 1985(2)–(3) and 1983, also fails to state a cognizable claim. Section 1985(2) prohibits conspiracies to obstruct justice in state or federal judicial proceedings, *see Kush v. Rutledge*, 460 U.S. 719, 724–25 (1983), but Polito fails to support such a claim with any factual allegations in the complaint and that provision is thus clearly inapplicable. Moreover, section 1985(3) requires an allegation that the "conspiracy . . . be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (quoting *United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 829 (1983)). No such class-based animus is alleged in the complaint, so this provision is also inapplicable.

To survive a motion to dismiss a section 1983 conspiracy claim, a plaintiff must allege (1) an agreement between a state actor and a private party or between separate state actors; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002); *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993). Polito's claim fails because, as outlined above, the alleged conduct in this case was not unconstitutional. *See Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 322 (S.D.N.Y. 2015).

E. State-Law Claims.

A district court has supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Nevertheless, supplemental jurisdiction over a claim may be declined when, among other circumstances, "the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). Taking into consideration the values of judicial economy, convenience, fairness, and comity, *see Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349–50 (1988), I decline to exercise supplemental jurisdiction over Polito's state-law claims. Those claims are dismissed without prejudice.

## CONCLUSION

The motion to dismiss the complaint is granted. I grant the plaintiff leave to replead within thirty (30) days of the date of this order.

**SO ORDERED.**

Brooklyn, New York
July 7, 2016

*Edward R. Korman*
Edward R. Korman
United States District Judge