NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JULIANNE POLITO,

Plaintiff,

– against –

THE CITY OF NEW YORK, THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE OF THE CITY OF NEW YORK, PATRICIA PATE, Individually and in her Official Capacity as Director of Provider Oversight, Bureau of Early Intervention of THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE OF THE CITY OF NEW YORK, NORA PUFFETT, Individually and in her Official Capacity as Director of Administration and Data Management of THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE OF THE CITY OF NEW YORK, DOLORES GIURDANELLA, Individually and in her Official Capacity as Director of the Manhattan Regional Office of the Bureau of Early Intervention Program of THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE OF THE CITY OF NEW YORK, JOHN AND JANE DOES 1 through 10, Individually and in his, her and its respective capacities as Officials of the City of New York and/or the State of New York, and JOHN AND JANE DOES 1 through 10, Individually,

Defendants.

MEMORANDUM & ORDER

15-CV-2301 (ERK) (RML)

KORMAN, *J.*:

Julianne Polito filed (and then amended) a complaint alleging that New York City officials had unlawfully pressured her private employer, a city contractor, into firing her. Dkts. 1, 34. The amended complaint was dismissed without prejudice based on the legal insufficiency of its federal claims. 1st Dismissal Order (Dkt. 50). Polito then filed a second amended complaint. Dkt. 55. Although the second amended complaint includes additional details of Polito's firing, it essentially

re-pleads the same legal theories found defective earlier. For that reason, I now dismiss the federal claims in the second amended complaint.

I do not, however, dismiss the complaint entirely. The essence of Polito's complaint is an allegation of tortious interference that invokes jurisdiction based on diversity of citizenship. The defendants have failed to establish that this cause of action is legally defective, and, at this early stage, I am required to assume the truth of plausibly pleaded allegations. But before discussing Polito's state-law claims, I first add to my earlier dismissal order a few brief thoughts on the federal claims. Note that this opinion assumes familiarity with the facts as discussed in the first dismissal order.

## I. Polito's Federal Claims

### A. Procedural Due Process

I have already held that the alleged conduct here is "random and unauthorized" (meaning the existence of the Article 78 procedure defeats Polito's procedural due-process claims). 1st Dismissal Order at 9–10, 12. I elaborate some on my earlier discussion. The Second Circuit has asked two questions in distinguishing between established state procedures and random and unauthorized conduct. The first, based on the Supreme Court's holding in *Zinermon v. Burch*, 494 U.S. 113, 138 (1990), is whether the "state [has] delegated to th[e] actors 'the power and authority to effect the very deprivation complained of.'" *Rivera–Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) (quoting *Zinermon*, 494 U.S. at 138). In *Zinermon*, hospital physicians, administrators, and other staff who had allegedly unlawfully confined the plaintiff in a mental hospital had been delegated not just "the power and authority to effect the" confinement but also "the concomitant duty to initiate the procedural safeguards … to guard against unlawful confinement." 494 U.S. at 114–15, 138. The confinement was therefore not "random" and "unauthorized." *Id.* at 138. The second question, intertwined with the first, is whether the acts are

2

of "high-ranking officials who are 'ultimate decision makers' and have 'final authority over significant matters,' even if those acts are contrary to law." *Rivera–Powell*, 470 F.3d at 465 (quoting *Velez v. Levy*, 401 F.3d 75, 91–92 & nn. 14, 15 (2d Cir. 2005)) (alteration omitted). Ultimately, the underlying issue is "whether the state [was] in a position to provide for predeprivation process." *Hudson v. Palmer*, 468 U.S. 517, 534 (1984).

The Second Circuit has described this theory as "not clear-cut," *Rivera–Powell*, 470 F.3d at 465, and there is conflict between the circuits as to various applications of the doctrine, *see* Marvin A. Schwartz, Section 1983 Litig. Claims & Defenses § 3.07 (4th Ed. 2018-1 Supplement). For example, in contrast to the Second Circuit, three circuits have held that the acts of high-level officials can be "random and unauthorized." *See id.* (citing *San Geronimo Caribe Project v. Acevedo–Vila*, 687 F.3d 465, 493 (1st Cir. 2012) (en banc); *Johnson v. La. Dep't of Agric.*, 18 F.3d 318, 322 (5th Cir. 1994); *Easter House v. Felder*, 910 F.2d 1387, 1400 (7th Cir. 1990) (en banc)). Nonetheless, the outcomes of the doctrine as applied by the Second Circuit provide helpful guideposts. The Second Circuit has found conduct random and unauthorized where the violation was not caused by an established state procedure and where, indeed, the city officials allegedly "acted in flagrant violation of the City Charter and [Procurement] Rules." *Hellenic Am. Neighborhood Action Comm. v. N.Y.C.*, 101 F.3d 877, 881 (2d Cir. 1996). As later observed by the Second Circuit, this conduct in *Hellenic* was "an arbitrary act by a state employee," for which "'it is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place.'" *Velez*, 401 F.3d at 92 & n. 14 (quoting *Hudson*, 468 U.S. at 532–33)). In contrast, in *DiBlasio v. Novello*, 344 F.3d 292, 295, 303 (2d Cir. 2003), in which the plaintiff brought a "stigma plus" claim based on allegedly defamatory statements to the press, the Second Circuit held that the actions of the commissioner of the city Department of Health and Mental Hygiene were not random and unauthorized because she was "a high-level state official with final

authority on many department matters, including the content of press releases and her own statements in press conferences." And in *Velez*, 401 F.3d at 79–80, in which the plaintiff alleged that the city schools chancellor removed her from the school board in retaliation for her political positions, the chancellor's actions were not random and unauthorized:

> Here, with respect to Chancellor Levy, our reasoning in *DiBlasio* applies with equal force. Levy is precisely the sort of high ranking official identified by this line of cases. Just as in *DiBlasio,* where the commissioner had the authority to suspend summarily DiBlasio's license, and had the duty as commissioner to ensure that the department followed the prescribed procedures governing summary suspensions, Levy had the authority to remove Velez, and the duty as Chancellor to follow the governing New York statutes and regulations. And, as in *DiBlasio*, any abuse of that authority that rose to the level of a due process violation cannot be considered random and unauthorized. Accordingly, Velez was entitled to a pre-deprivation hearing before Levy executed the decision to remove her from the board.

*Id.* at 92 (citations, quotation marks, and footnotes omitted). *See also Rivera–Powell*, 470 F.3d at 466 (suggesting, in *dicta*, that the Board of Elections' actions were not random and unauthorized because state law had delegated to it the authority to remove candidates from the ballot). Here, the defendants were *not* "authorized to terminate or interfere with any agreement" between Polito and her employer. 2d Amend. Compl. ¶ 52. Rather, the complaint specifically alleges that the defendants operated well outside established rules. *See id.* at ¶ 100.

Similarly, even the actions of the city's Chief Procurement Officer relating to procurement have been held to be random and unauthorized because he "did not have 'final authority over significant matters.'" *Rivera–Powell*, 470 F.3d at 466 (quoting *Novello*, 344 F.3d at 303 n.3). The employment pressure alleged of the low-level individual defendants here—administrators within one sub-agency within the city Department of Health and Mental Hygiene, 2d Amend. Compl. ¶¶ 11–19—would tend to be random and unauthorized. The defendants are not akin in authority to

the chancellor of city schools or the commissioner of their department. *Cf. Velez*, 401 F.3d at 92; *Novello*, 344 F.3d at 303.

This conclusion makes sense because, again, the underlying question is "whether the state [was] in a position to provide for predeprivation process." *Hudson*, 468 U.S. at 534. The complaint here alleges the operation of an "insidious conspiracy." 2d Amend. Compl. ¶ 87. Ultimately, and unfortunately, no matter how the inquiry is phrased doctrinally, there is no reasonable way that the state can provide pre-deprivation process in this circumstance.

*B. Stigma Plus*

Second, Polito's "stigma plus" claim fails for want of a "plus." My earlier order expressed that Polito's ability to find a new job in three months, 2d Amend. Compl. ¶ 99, likely meant that the state had not deprived her of a tangible interest. 1st Dismissal Order at 11. That is so. In *Rudow v. N.Y.C.*, 822 F.2d 324 (2d Cir. 1987), Rudow lost his private-sector job after the city's Human Rights Commission found him responsible for sexual harassment. *Id.* at 326. Even if that finding was factually incorrect, *id.* at 329, Rudow did not allege any deprivation sufficient to concern the Due Process Clause:

> He has not suffered the loss of public employment, nor has he been prevented from practicing his profession. His loss of the top job at his firm is an inadequate addendum to his reputation claim. He has not been prevented from engaging in the everyday activities of life.

*Id.* at 330 (citations omitted). It is equally true that the loss of Polito's job is an "inadequate addendum" to her claim. *See also Neu v. Corcoran*, 869 F.2d 662, 666–70 (2d Cir. 1989) (discussing the "plus" in a "stigma plus" claim).

*C. Substantive Due Process*

Finally, I address what appears to be a new legal theory in Polito's second amended complaint, that the defendants "arbitrarily took Dr. Polito's right to continue to engage in her chosen profession." Pl.'s Resp. to Def.'s Mot. to Dismiss (Dkt. 63) at 36. That is, distinct from the

"stigma plus" claim, when the defendants caused Polito's firing, they violated Polito's substantive due-process interest in "follow[ing] any lawful calling, business, or profession." *Dent v. West Virginia*, 129 U.S. 114, 121 (1889). This goes too far. Polito was not forced to give up her calling; she was fired from one job as an independent contractor and soon found other work. *See Engquist v. Ore. Dep't of Agric.*, 478 F.3d 985, 996–99 (9th Cir. 2007) (explaining that only extreme actions, those affecting job prospects to the same degree as legislation, can violate the right to pursue a profession). Taken as true, Polito's complaint does describe an injustice, but "the Fourteenth Amendment [should] not be interpreted so broadly as to turn every state-law tort committed by a state official into a constitutional violation." *Neu*, 869 F.2d at 666. The crux of Polito's complaint is not a violation of her constitutional rights; it is a theory of tortious interference under state law.

## II. Polito's State-Law Claims: Tortious Interference …

To which I now turn. When I dismissed Polito's first amended complaint, I declined to exercise supplemental jurisdiction over her state-law claims. 1st Dismissal Order at 16. This was a mistake. Then and now, Polito pleaded that she brings her state-law claims under both supplemental and diversity jurisdiction. 2d Amend. Compl. ¶ 4; *see also* 1st Amend. Compl. (Dkt. 34) at ¶ 4. Complete diversity of citizenship appears to be present between Polito, who says she moved to Florida in response to the events complained of, and the defendants, all of whom are affiliated with New York. *Id.* at ¶¶ 6–24, 99. No party has suggested otherwise. Additionally, Polito has plausibly pleaded that the value of her claims exceeds $75,000. *E.g.*, 2d Amend. Compl. ¶ 199. Accordingly, I analyze Polito's three state-law claims on the merits. *See* 28 U.S.C. § 1332. All are varieties of tortious interference.

### A. … With State Certification

The most esoteric of these is "tortious interference with state certification as an early intervention provider." 2d Amend. Compl. ¶¶ 202–03. Polito does not explain the elements of this

cause of action; indeed, she does not discuss it at all in her response to the defendants' current motion to dismiss. Pl.'s Resp. to Def.'s Mot. to Dismiss at 46–47. In my own review of New York law, I have been unable to verify that such a claim even exists. If it does, it would surely fail here, where Polito pleaded that her certification was never suspended or revoked—that is, that her state certification was not actually interfered with. 2d Amend. Compl. ¶ 101.

### B.  … With Prospective Employment Contracts

Polito's second state-law claim is for tortious interference with prospective employment contracts. 2d Amend. Compl. ¶¶ 200–01. She does not defend this claim in her briefing either. Pl.'s Resp. to Def.'s Mot. to Dismiss at 46–47. Under New York law, tortious interference with prospective economic relations includes—and, indeed, may be limited to—(1) crimes, independent torts, or conduct engaged in for "the sole purpose of inflicting intentional harm" that (2) interferes with prospective contracts or other nonbinding economic relations. *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189–91 (2004) (quoting *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 215 A.D.2d 990, 990 (3d Dep't 1995), *aff'd*, 87 N.Y.2d 614 (1996)). Here, Polito has alleged no conduct that interfered with prospective economic relations rather than with the employment from which she was dismissed. The only allegation that even possibly qualifies is that one defendant encouraged certain city officials to "'be on the lookout for' Dr. Polito," but Polito does not mention any economic interference caused by this warning. 2d Amend. Compl. ¶ 99; *see also id.* at ¶¶ 80–81. Rather, Polito's point seems to be that she moved from New York to Florida because she believed that the defendants, having caused her firing once, could cause her to be fired again. *See id.* at ¶¶ 99, 201. In other words, she objects to *prospective* tortious interference with prospective employment contracts. Given, however, that the tort requires actual interference, Polito cannot object to what the defendants merely might have done.

*C. ... With Employment*

Finally, Polito alleges traditional tortious interference with employment. 2d Amend. Compl. ¶¶ 185–99. "Under New York law, the elements of a tortious interference [with contract] claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001) (quoting *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d. Cir 1996)). With respect to this claim, the defendants primarily argue that employees can never recover for tortious interference if their employment was at will. Br. in Supp. of Def.'s Mot. to Dismiss at 31. The cases the defendants cite for this proposition, however, establish only the obvious point that dismissed employees cannot avoid employment at will by bringing tortious-interference claims against their former employers. *See Ingle v. Glamore Motor Sales Inc.*, 73 N.Y.2d 183, 188–89 (1989); *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 300–02 (1983); *Lobel v. Maimonides Med. Ctr.*, 39 A.D.3d 275, 276–77 (1st Dep't 2007). The cases do not hold that at-will employment bars claims when an employee's relationship with her employer is attacked by a third party. In fact (although Polito does not cite this case law either), the Second Circuit has held that "[a]n at-will employee may maintain a tortious interference claim" under New York law if she can "establish that 'a third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with

8

malice.'" *Loksen*, 239 F.3d at 274 (quoting *Cohen v. Davis*, 926 F. Supp. 399, 403 (S.D.N.Y. 1996) (collecting cases)). This view is amply supported by other authorities as well.[1]

The defendants' only response is an argument that tortious-interference claims against third parties are limited to those situations in which the "defendants' actions were done for the sole purpose of harming [the] plaintiff." Br. in Supp. of Def.'s Mot. to Dismiss at 31. The defendants' only citation in support of their theory (arguably to *dicta*), *see Lobel*, 39 A.D.3d at 276–77, itself relies only on a holding that the "the sole purpose of inflicting intentional harm" was one of *several* ways conduct could rise to intentional interference with *prospective* economic relations, a tort that requires *more* culpable conduct, *Noonan*, 3 N.Y.3d at 189–90. Admittedly, the complaint itself states that the defendants were not motivated solely by malice: they were attempting to respond to a parent's complaint. 2d Amend. Compl. ¶ 55(c). Under Second Circuit law, however, it is enough to ask whether the defendants caused Polito's firing using "wrongful means." *Loksen*, 239 F.3d at 274.

At the pleading stage, the answer appears to be yes, this being the thrust of Polito's complaint. Polito alleges that the defendants threatened her employer "with economic ruin if [it] did not terminate Dr. Polito's contract." 2d Amend. Compl. ¶¶ 42, 58; *see Lurie v. New Amsterdam Casualty Co.*, 270 N.Y. 379, 381 (1936) (upholding tortious-interference verdict where insurer

---

[1] *See, e.g.*, *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 194 (1980) ("Where contracts terminable at will have been involved, we have upheld complaints and recoveries in actions seeking damages for interference when the alleged means employed by the one interfering were wrongful, as consisting of fraudulent representations, or threats or as in violation of a duty of fidelity owed to the plaintiff by the defendant." (citations omitted)); 72 N.Y. Jur. 2d Interference § 37 (updated Nov. 2017) (variously describing tortious interference as requiring that "the defendant acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort"; "that the defendant either acted with the sole purpose of harming the plaintiff or by means that were dishonest, unfair, or improper"; or "that the defendant interfered … either with the sole purpose of harming the plaintiff or by means that were unlawful or improper or that the interference was effected by unlawful means or, under the theory of prima facie tort, by lawful means without justification"); 2 N.Y. Pattern Jury Instructions Civil 508–09 (2d ed. 2008) (requiring "malice" or "wrongful means" to defeat the defense of justification); Restatement (Second) of Torts § 766 & cmt. j (1979) ("The rule stated in this Section is applicable if the actor … desires to interfere, even though he acts for some other purpose in addition.").

threatened to withhold payment to car-accident victim unless victim fired his at-will attorney). The

defendants here did so despite their alleged lack of any legal authority. 2d Amend. Compl. ¶ 100.

Indeed, the defendants' very argument that any acts were random and unauthorized, Br. in Supp.

of Def.'s Mot. to Dismiss at 16, tends to suggest that their conduct was arbitrary—"wrongful"—

interference with Polito's employment. And in the course of these acts, the defendants also

"defamed Dr. Polito." 2d Amend. Compl. ¶ 86. As a result, Polito was in fact fired, causing her

damages. *Id.* at ¶¶ 57, 70. These allegations are plausibly supported by documentary evidence and

the pleading of specific dates, names, and details. Of course, discovery may well reveal that the

defendants' actions were a justified response to a parent's valid complaint rather than what Polito

describes. At this early, pleading stage, however, Polito's plausible allegations must be credited.

*See Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).[2]

\* \* \*

The defendants' motion to dismiss is granted as to Polito's first, second, third, fourth, fifth,

seventh, and eighth claims. The motion is denied as to Polito's sixth claim, for tortious interference

with employment.

**SO ORDERED.**

Brooklyn, New York
December 21, 2017

*Edward R. Korman*
Edward R. Korman
United States District Judge

---

[2] Although Polito says she was an independent contractor, she describes this cause of action as "tortious
interference with contract of employment." 2d Amend. Compl. at p. 41. The defendants argue their motion to dismiss
as if Polito had been an employee; they make no reference to her status as an independent contractor. Br. in Supp. of
Def.'s Mot. to Dismiss at 31. And Polito, who worked at her job part-time from 2006—full-time from 2011—appears
to have been a *de facto* employee. 2d Amend. Compl. ¶¶ 186, 191. Accordingly, I have analyzed this cause of action
through the lens of an employer–employee relationship.